[Cite as *In re B.M.*, 2023-Ohio-1112.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

IN RE: : 

B.M., et al. : CASE NOS. CA2022-11-028
CA2022-11-029

: 

O P I N I O N
: 3/30/2023

: 

: 

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2020374 and 20203075

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

Holly M. Simpson, for appellant.

**HENDRICKSON, J.**

{¶1} Appellant, the biological father of B.M. and J.M. ("Father"), appeals from a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of his sons to appellee, Clinton County Children Services ("the Agency"). For the reasons discussed below, we affirm the juvenile court's decision.

{¶2} B.M. ("Billy"), born March 15, 2017, and J.M. ("Josh"), born March 30, 2018,

are the two youngest children of Mother and Father. Billy and Josh have two half-sisters from their Mother, M.C. ("Mary"), born January 1, 2010, and A.N. ("Anna"), born December 30, 2011, who were also part of the permanent custody proceedings. Billy and Josh also have three paternal half-sisters, J.M. ("Jane"), K.M. ("Kim"), and S.M ("Sarah").[1] Though Jane, Kim, and Sarah were adults by the time of the permanent custody proceedings, they were involved in various investigations the Agency conducted into the family while they were minors.

{¶3} Mother first became involved with the Agency in 2012, after it was discovered that Mother had left Anna, then seven months old, home alone for more than 30 minutes while she went to a neighbor's house with Mary. Mother was ultimately convicted in the Clinton County Municipal Court on one count of endangering children, a misdemeanor of the first degree. Anna was adjudicated neglected and Mary adjudicated dependent in November 2012. Following Mother's progress on a case plan, the Agency's case was closed.

{¶4} The Agency became involved with Mother again in February 2014, after it was reported that Anna's biological father was sexually abusing Mary. The allegations were substantiated and approximately one month later, the Agency ended its involvement.

{¶5} In May 2014, the Agency's alternative response unit became involved with Mother after it received reports that Mother had been observed being "very rough" with Mary—pulling her by the arm and hair. The Agency also received a report that the evening after Mother had been out partying, Mother had fallen asleep and Mary and Anna, then four and two years old, respectively, were outside playing in the street. This later incident led to

---

1. The names Billy, Josh, Mary, Anna, Jane, Kim, and Sarah are pseudonyms adopted in this opinion for purposes of privacy and readability.

Mother's conviction in the Clinton County Court of Common Pleas on one count of endangering children, a felony of the fourth degree, for which Mother received a two-year community control sentence.

{¶6} In July 2014, Father and Mother married after five months of dating. A few months later, near the end of January 2015, the Agency opened an investigation after it received reports that Mother was drinking one to one-and-one-half bottles of tequila every day and was using marijuana and crack cocaine. Mother had brought the drugs into the family's home, smoking marijuana with her stepdaughter Jane, and allowing Mary to hold a crack pipe. Mother's behavior had also become erratic. She threatened to kill her stepdaughter Sarah and one of Sarah's cats, and she had run naked through the family home, chasing the children with sex toys.

{¶7} The Agency spoke with Father about Mother's reported conduct and its concerns with her interactions with the children. At that time, Father indicated he was aware of Mother's drug usage, but he did not think it was occurring in the home. The Agency filed a complaint in the juvenile court and Mary and Anna were adjudicated dependent. The Agency was granted protective supervision over Mary and Anna, and the girls were placed in Father's temporary custody. A case plan for the family was adopted, which included drug and alcohol counseling for Mother, a mental health assessment and mental health counseling for Mother and Father, and the completion of parenting classes by both Mother and Father. Mother and Father completed case plan objectives and the Agency ceased its involvement.

{¶8} Billy was born in March 2017. About one month after his birth, near the end of April 2017, the Agency opened an investigation after it received reports of domestic violence incidents involving Mother and Father, reports that Mother was smoking marijuana

with Sarah, and reports that Mother was sexually abusing Sarah. Regarding the domestic violence incidents, Mother was alleged to be the aggressor, yelling and screaming at Father, punching him in the face, and breaking a lamp over his head—incidents that were observed by the children.

{¶9} With respect to the sexual abuse allegations, it was alleged that Mother had sexually abused Sarah by digitally penetrating Sarah's vagina while Mary and Anna were in the room. On one occasion, Mary caught Mother performing oral sex on Sarah in the family's kitchen. Father did not believe the allegations and was unwilling to leave Mother. As a result, the children were removed from the home. In August 2017, Sarah, Mary, and Anna were adjudicated abused children and Billy was adjudicated a dependent child. A case plan for reunification was developed, which required family counseling, Mother to undergo substance abuse treatment, and Mother and Father to undergo mental health counseling. Mother was not permitted to have any unsupervised visitation with the children.

{¶10} On March 30, 2018, while the Agency's involvement was ongoing, Josh was born to Mother and Father. Progress was made on the case plan when, in November 2018, just as the Agency was preparing to close its case, the Agency received notice that Mother had been pulled over for drinking and driving with Mary, Anna, Billy, and Josh in the car. Mother was charged with four counts of endangering children. Rather than filing a new complaint, the Agency continued to work with the family under the old case number. In June 2019, the Agency closed its case after Mother completed inpatient substance abuse treatment, started taking a Vivitrol shot, and was placed on psychotropic medication.

{¶11} In September 2020, the Agency received a report that Mother had been pulled over with Mary and Anna in the car and methamphetamine had been found in her purse. One of the children was also improperly secured in her seat. Mother was charged and

convicted of endangering children, a misdemeanor of the first degree. Mary and Anna were placed in the Agency's temporary custody on October 5, 2020 and subsequently adjudicated neglected children on December 4, 2020. Mother was prohibited from having unsupervised contact with any of her children.

{¶12} At this time, Billy, Josh, and Father were living with some of Father's friends in Clermont County, as Mother and Father had separated. The Agency contacted Father and informed him that Mother was not permitted to have any unsupervised contact with the boys. Despite this warning, the Agency received a report on November 24, 2020, that Mother and Father were once again living together, this time at the home of one of Mother's friends. Mother's and Father's living arrangement had been disclosed when the couple contacted the Clinton County Ho Ho Shop, a nonprofit organization that helps provide Christmas gifts to children in need. Mother and Father appeared to be under the influence of alcohol when they contacted the Ho Ho Shop.

{¶13} The following day, on November 25, 2020, the Agency verified the report that Mother and Father had reconciled by sending a caseworker to Mother's friend's house. Mother's friend informed the Agency that Father, Billy, and Josh had been staying at the home with Mother and that Mother had unsupervised contact with Billy and Josh.

{¶14} The Agency moved for emergency removal of Billy and Josh that same day. Following a hearing held that date, the juvenile court granted the Agency temporary custody over Billy and Josh. The court also ordered that a guardian ad litem be appointed for the children and it gave the Agency discretion over matters of visitation and placement. Despite efforts to place the children with relatives, including paternal grandmother and a maternal aunt, the Agency was unable to find a family member to care for the children. Billy and Josh were placed in the same foster home as Mary and Anna.

{¶15} On December 3, 2020, the Agency filed a complaint alleging that Billy and Josh were abused, neglected, and dependent children. The complaint noted the Agency's open case involving Mary and Anna, recent admissions by Mother that she was abusing methamphetamines and alcohol, Father's failure to abide by the Agency's directive that Billy and Josh were not to have unsupervised contact with Mother, and reports that Father had been drinking alcohol heavily. On February 9, 2021, following Mother's and Father's admissions, Billy and Josh were adjudicated dependent children and the abuse and neglect allegations were dismissed. The court continued the order of temporary custody with the Agency.

{¶16} On March 4, 2021, the juvenile court adopted a case plan for Mother's and Father's reunification with the children. The case plan required Mother and Father to complete a mental health assessment and any recommended treatment, complete an alcohol and drug assessment and any recommended treatment, submit to random drug screens, complete parenting classes and a parenting workbook, undergo domestic violence and marriage counseling, and obtain and maintain appropriate housing and a steady income.

{¶17} Mother and Father began working on the case plan while exercising weekly supervised visitation with Billy, Josh, Mary, and Anna. On December 13, 2021, the juvenile court granted a six-month extension of the Agency's temporary custody over Billy and Josh. Mother's and Father's visitations progressed to one unsupervised visitation per week in May 2021. In August 2021, Mother and Father had progressed to one overnight visit per week. However, the unsupervised and overnight visits were halted less than two months later after the Agency learned of a September 2021 domestic violence incident between Mother and Father and learned that Mother violated her probation in November 2021.

- 6 -

{¶18} On February 10, 2022, the Agency moved to modify its temporary custody of all four children to permanent custody. The Agency alleged that the children had been in its temporary custody for at least 12 months of a consecutive 22-month period, with Mary and Anna being in the Agency's temporary custody since October 5, 2020 and Billy and Josh in the Agency's temporary custody since November 25, 2020. The Agency alleged that permanent custody was in the children's best interest given Mother's and Father's lack of progress on the case plan, the continued concerns of domestic violence, Mother's and Father's failure to maintain sobriety, and their failure to "successfully complete[] drug and alcohol cessation programming."

{¶19} In mid-March 2022, Father was appointed new counsel as his previous counsel had moved out of state. Father's counsel was granted a continuance to allow him adequate time to prepare for the permanent custody hearing.

{¶20} A hearing on the Agency's motion for permanent custody was scheduled for August 23, 2022. A week before the scheduled hearing, on August 16, 2022, the children's guardian ad litem filed a report stating that a grant of permanent custody to the Agency was in the children's best interest. In recommending that permanent custody be granted, the guardian ad litem noted Mother's abuse of drugs, Mother's and Father's continued use of alcohol and their failure to show up for drug screens, and Father's and Mother's unhealthy, continuing relationship.

{¶21} On August 19, 2022, a few days before the permanent custody hearing commenced, Father filed a motion for legal custody of Billy and Josh. The court noted the filing of the motion at the start of permanent custody hearing, but indicated the motion would be heard at a later date. The parties and their attorneys were identified at the start of the hearing, with Mother's attorney stating that Mother consented to the Agency's motion for

permanent custody of Mary, Anna, Billy, and Josh.[2]  Thereafter, the juvenile court heard testimony from Gina May, the supervisor who oversaw the children's case with the Agency, Jessica Ladnow, a protective caseworker and supervisor with the Agency, Amanda Quallen, a caseworker within the Ohio Sobriety, Treatment, and Reducing Trauma ("Ohio START") program, Father, and Father's daughter Kim.

{¶22}  May testified about the Agency's involvement with the family, explaining that she has been involved as both a caseworker and as a supervisor.  After detailing the various investigations the Agency had conducted since 2012, May discussed the problems that have persisted with the family throughout the years.  May noted multiple domestic violence incidents had occurred between the parties, some of which were witnessed by the children.  Though Mother was normally the aggressor, throwing lamps and punching Father, May was aware of an instance in 2020 where Father struck Mother.

{¶23}  Mother's ongoing substance abuse was also a major concern for the Agency.  May noted Mother had a history of abusing cocaine, methamphetamine, marijuana, and alcohol.  On one occasion, Mother appeared at the Agency intoxicated.  When driven home by a caseworker, Father "shrugged off" Mother's intoxicated state.  May stated that Mother's substance abuse issues impacted Mother's mental health and placed the children at risk.

{¶24}  As for Father, May noted that Father remains in a toxic relationship with Mother, even when it has negatively impacted the children.  Father placed his relationship with Mother above the safety of his children, noting that Father stayed with Mother despite the instances of domestic violence, Mother's sex abuse of Sarah, Mother's abuse of alcohol and drugs around the children, including smoking marijuana with Jane and Sarah, and

---

2. Anna's biological father consented to the Agency's motion for permanent custody of his daughter.  Mary's biological father was not involved in her life, declined to be added to the case plan, and did not appear at the permanent custody hearing.  Mary's biological father was found to have abandoned her.

- 8 -

Mother's multiple convictions for child endangerment. Father had discussed with May the idea of leaving Mother, and he followed through on one occasion. However, he returned to the relationship a few months later. May was aware that Father claimed to have filed for divorce from Mother, but May did not believe Father would actually change his relationship pattern with Mother.

{¶25} May noted that Mother had completed three parenting classes and Father one class, but neither were able to implement the skills they were taught. Neither Mother nor Father "demonstrated consistent protective capacity for the kids," and Father's actions demonstrated he was unable to put anyone but Mother first.

{¶26} May further testified that stable housing had historically been an issue for Mother and Father. The couple had been formally evicted from a rental house at one point. Another time, a home they were renting was sold out from under them and the Agency had to assist them with rent at a new place. At various points in time, Mother, Father, and the children, including Billy and Josh, ended up staying with friends. They also resided in a camper for a few months. Most recently, Mother and Father were residing in a three-bedroom apartment in Blanchester, which they had rented for over a year. May noted that Father has limited income as he is on social security disability.

{¶27} May testified that it was her professional opinion that the children, including Billy and Josh, were in need of stability and that it could not be achieved without a grant of permanent custody to the Agency. May noted that Mother and Father "have gone through every service that I can think of that the Agency could put together for them to make things better. Yet, they are not getting better."

{¶28} Ladnow testified she has been the Agency supervisor on Mother's and Father's case since January 2020. She explained that Mother and Father were offered

more intensive services than a typical case would be offered as they participated in the Ohio START program. Under the Ohio START program, a caseworker met with the family at least once per week for the first 60 days and then tapered down visits to bi-weekly face-to-face meetings. Additionally, under the Ohio START program, Mother and Father were paired with a "parent mentor" for guidance. The parent mentor was someone who was in active recovery from a substance use disorder and had "lived experience" dealing with the Agency.

**{¶29}** Despite the intensive services offered to Mother and Father, Ladnow testified the Agency had ongoing concerns about Mother's and Father's alcohol use and Mother's use of methamphetamine. Mother was put on an alcohol ankle monitor, but continued to consume alcohol, telling the caseworker that she knew how to alter the monitor so that it would not read properly. Mother had repeatedly tested positive for illegal drugs, including testing positive for methamphetamine in February 2022. Father had relapsed and started using alcohol again after 10 years of sobriety. He admitted to the caseworker that he had consumed alcohol prior to an Ohio START program meeting on at least one occasion. In November 2021, after a hearing before the juvenile court, and on January 28, 2022, Father tested positive for alcohol in a urine screen. Father also had two "no-shows" for alcohol screenings, which the Agency treated as positive screens.

**{¶30}** Ladnow testified that Mother and Father had engaged in marriage counseling at Solutions. Father had been receiving mental health services there since 2016, and he consistently attended meetings and counseling sessions. After unsuccessfully being treated at Brightview for her drug and alcohol addiction, Mother briefly engaged in mental health and addiction services at Solutions. However, she was no longer a client there.

**{¶31}** Ladnow testified that Mother and Father's income was a concern to the

Agency. Despite the family being on a limited budget, consisting primarily of Father's social security disability income, the couple consistently purchased new things. When the Agency sought to discuss Mother's and Father's assets and budget, Mother and Father became defensive and were not forthcoming about where the influx of cash to purchase the items was coming from. Mother and Father claimed to have taken out a $10,000 loan, but did not provide any proof or documentation to support that claim.

{¶32} Ladnow discussed Mother's and Father's visitations with the children, noting that when visitation was first established, it occurred only once per week and was supervised. In May 2021 it briefly progressed to unsupervised visitation and then progressed in August 2021 to overnight visitation, but those visits were halted less than two months after being started as a result of a domestic violence incident between Mother and Father and Mother violating her probation. Ladnow testified that the unsupervised visitations were also having a negative effect on the children, causing the children to have "increased behaviors." Father exercised supervised visitation with Billy and Josh twice per week, once at the Agency and once at the children's soccer fields. Ladnow testified Father was consistent in his visitation with the children, and Billy and Josh have a good relationship with Father.

{¶33} Despite Father's good relationship with Billy and Josh, Ladnow believed permanent custody was in the best interest of the children as the children were in need of legally secure placement. Ladnow noted that the Agency has a "huge concern" that if Father were to regain custody, he would not keep the children away from Mother.

{¶34} Quallen, the Ohio START caseworker assigned to work with Mother and Father, testified that Mother's and Father's alcohol use and Mother's drug use remained a concern as of the time of the permanent custody hearing. Mother and Father missed a

random drug and alcohol screening in May 2022. When Quallen met with Mother and Father in June 2022, Mother admitted she was drinking alcohol and using methamphetamine. Mother also claimed that Father was still drinking, usually "two to three beers, and occasionally on the weekends." Father denied this allegation when he spoke to Quallen, stating that Mother was lying because she did not want him to get custody of Billy and Josh.

{¶35} Quallen testified Father had made some progress on his case plan, completing substance use disorder treatment, staying engaged in mental health counseling at Solutions, and regularly attending A.A. meetings. Father had also completed a parenting class and done the required parenting workbook, though he received the lowest passing grade possible on the workbook. While Father had indicated to Quallen that he intended to move into an apartment in Lebanon, Father had not made the move. He remained in the Blanchester apartment, allowing Mother to come and go as she decided. He also had not complied with Agency requests to produce bank statements or other documents demonstrating he was still receiving social security disability income or that he had obtained a $10,000 loan.

{¶36} Quallen testified that Billy and Josh have been diagnosed with an adjustment disorder and have been in counseling the last six months. Father has been pretty consistent in visiting with his sons. However, in May 2022, Father failed to show up at one of the children's soccer practices for a visit. Father also failed to appear at Billy's kindergarten assessment, despite being reminded by Quallen the day prior. When Father does visit the children, the visits go well. Father brings appropriate meals and toys to the children, and Billy and Josh are bonded with Father. Nonetheless, despite this bond, Quallen testified that she believes it is in Billy's and Josh's best interest for permanent custody to be granted

as the children are in need of legally secure placement and that cannot be achieved without the grant of permanent custody.

{¶37} Following Quallen's testimony, Kim, Father's oldest daughter, was called as a witness by Father. She testified that she has two children, ages three and four, who reside with her in an apartment in Lebanon. She stated Father was going to be moving into the same apartment building, just a floor down from her, which would not only allow her to provide support for Father, but would give her children and Billy and Josh the opportunity to continue to play with one another and maintain a familial bond.

{¶38} Kim stated that Father had gained custody of her when she was around fourteen years old. He not only provided her with life's necessities – housing, clothing, and food – but he made sure she graduated from high school and had everything she needed to "make it" when she turned eighteen. Kim believed Father was capable of doing the same for Billy and Josh.

{¶39} With respect to Father's relationship with Mother, Kim noted the negative impact the relationship had on Father's sobriety. Kim testified that Father had been sober for approximately ten years prior to marrying Mother. After the two were married, Father started drinking again. Kim testified she had been urging Father to end his relationship with Mother for about half of the duration of the marriage. Though Father had not ended things with Mother in the past, Kim believed he was serious about divorcing Mother and staying away from her this time. She testified, "this is the farthest he has taken the action. He's said it multiple times, and he never did the things he said he was going to do, and he's finally doing it [this time]. * * * He's moving. He has filed for the divorce[.]"

{¶40} Father testified that he and Mother have separated and he filed for divorce approximately two months before the hearing, in June 2022. He explained he filed for

divorce because "enough is enough" and it became clear that Mother was not going to make the right choices to get her life back together and to regain custody of the children. He acknowledged that he had separated from Mother in the past, around July 2020, only to return to his relationship with Mother a few months later in November 2020. He also acknowledged that he continued a relationship with Mother even after the allegations that Mother had sexually abused his daughter Sarah had come to light. Father claimed he "didn't know what to believe" with respect to the abuse allegations.

{¶41} Father testified he was currently residing in Blanchester in the apartment he had shared with Mother, though he claimed he was going to be moving into a three-bedroom apartment in Lebanon soon. Father indicated he intended to sign a lease for the Lebanon apartment the day after the permanent custody hearing. Father stated he had friends and family, including Kim, who lived nearby and would provide a network of support for him, Billy, and Josh. Regarding the Blanchester apartment where he was still staying, Father testified that Mother had essentially moved out. She no longer stayed at the apartment, but kept her belongings there and stopped by to pick up items she needed.

{¶42} Father also testified that when Billy and Josh were removed from his custody on November 25, 2020, he was not residing with Mother at Mother's friend's house. Rather, Father claimed that he and Billy and Josh had just been visiting Mother at Mother's friend's house. Father claimed that he and the children had driven to Mother's friend's home around 2:00 a.m. or 3:00 a.m. and stayed overnight so that Father could "keep an eye on" Mother while she detoxed from the drugs she had taken. He claims that Billy and Josh were being supervised by him while they were there.

{¶43} Father testified that he receives social security disability income of approximately $2,800 a month, and this amount of money is sufficient for him to pay his

monthly bills and support himself, Billy, and Josh. Father's monthly rent at the Lebanon apartment will be $711 a month. He also pays $280 a month on a $10,000 loan he took out from Upstart in February 2022, which he took out in order to consolidate debt and build up his credit score. Father admitted that he never provided the Agency with copies of his bank statements or proof of his income, despite being asked by the Agency a number of times to provide the information. Father claimed, "it just kind of slipped my mind."

{¶44} Father testified that he was making progress on his case plan. With respect to his mental health, Father noted that he has been participating in counseling and he sees his counselor once every two weeks. He also takes prescription medication for a schizoaffective disorder diagnosis.

{¶45} Regarding his drinking, Father testified that prior to starting a relationship with Mother, he had been sober for ten years. He started drinking again because he was stressed out and was having trouble sleeping. He denied that he drank when Billy or Josh were present and stated that there have been no criminal charges filed against him as a result of his alcohol use. He did, however, admit to testing positive for alcohol use a couple of times, the latest being in January 2022. He also admitted to missing a drug and alcohol screening the Agency set up, but claimed that occurred because he was hunting and camping somewhere remote without cell service and he did not know he needed to appear for the screening.

{¶46} Father testified he and Billy and Josh are bonded with one another. He regularly visits the children, seeing them twice per week – once at the Agency and once at their soccer practices. During their visits, Father and the boys play board games and video games. Father testified he wants custody of Josh and Billy, and he would be willing to abide by a court order that prohibited him from allowing Mother to have contact with the children.

{¶47} No other witnesses were called by Father or by the Agency. The court inquired if any of the parties wished to cross-examine the guardian ad litem about her August 16, 2022 report recommending that permanent custody be granted to the Agency. The parties declined to do so. The court then asked the guardian ad litem whether any of the testimony or evidence introduced at the hearing changed her recommendation and she answered in the negative. She also informed the court that Father had not been telling the truth when he described the time he spent with Mother in November 2020. The guardian ad litem noted that though Father claimed he had gone to Mother's friend's home around 2:00 a.m. or 3:00 a.m. on November 25, 2020, he had been spending time with Mother before that date. Mother and Father had been together the day before, when they had contacted her on November 24, 2020 to request assistance from the Ho Ho Shop.

{¶48} After hearing the foregoing testimony, the juvenile court took the matter under advisement and permitted the parties to file written closing arguments if they desired. No party chose to do so. On November 2, 2022, the court issued its decision granting the Agency's motion for permanent custody of Mary, Anna, Billy, and Josh. The court found that all the children had been in the temporary custody of the Agency for 12 months of the last 22 months and that it was in their best interest for permanent custody to be awarded to the Agency. The court noted that "despite reasonable case planning and diligent efforts by the Agency to assist the family, the parents have repeatedly failed to substantially remedy the conditions that caused the children to be placed outside the home." After considering the length of time the children had been in the care of the Agency, the repeating conduct of the parents that required Agency involvement, and the fact that no secure relative placement was available, the trial court concluded that "a legally secure permanent placement cannot be assured without a grant of permanent custody to the Agency."

{¶49} Father appealed the juvenile court's decision, raising two assignments of error for review.

{¶50} Assignment of Error No. 1:

{¶51} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO THE STATE BECAUSE THE DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶52} Before a parent's constitutionally protected liberty interest in the care and custody of his or her children may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. "This court will therefore reverse a juvenile court's decision to grant permanent custody only if there is a sufficient conflict in the evidence presented." *In re L.S.*, 12th Dist. Brown Nos. CA2019-03-001 and CA2019-03-002, 2019-Ohio-3143, ¶ 17, citing *In re K.A.*, 12th Dist. Butler No. CA2016-07-140, 2016-Ohio-7911, ¶ 10. "However, even if the juvenile court's decision is supported by sufficient evidence, 'an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re C.S.*, 12th Dist. Clinton No. CA2020-04-006, 2020-Ohio-4414, ¶ 15, quoting *In re T.P.*, 12th Dist. Butler No. CA2015-08-164, 2016-Ohio-72, ¶ 19.

{¶53} In determining whether a juvenile court's decision to grant a motion for

permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 12th Dist. Warren Nos. CA2018-08-088 thru CA2018-08-091 and CA2018-08-095 thru CA2018-08-097, 2019-Ohio-198, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 12th Dist. Butler No. CA2019-08-129, 2019-Ohio-5367, ¶ 15, citing *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25.

{¶54} Pursuant to R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9; *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child

in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio- 3188, ¶ 12.

**{¶55}** In this case, the juvenile court found that Billy and Josh had been in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period at the time the Agency filed its motions for permanent custody. This finding is not disputed by Father and is supported by the record, as Billy and Josh were removed from Father's care on November 25, 2020, adjudicated dependent on February 9, 2021, and the Agency did not move for permanent custody until February 10, 2022.[3]

**{¶56}** Father disputes the juvenile court's finding that permanent custody was in Billy's and Josh's best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 32. These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent

---

3. Pursuant to R.C. 2151.414(B)(1)(e), "[f]or purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after removal of the child from the home." Applying the statutory calculation enumerated in R.C. 2151.414(B)(1)(e), Billy and Josh are considered to have entered the Agency's temporary custody on January 24, 2021, which was 60 days after being removed from Father's and Mother's home. Billy and Josh were therefore in the Agency's custody more than 12 months of a consecutive 22-month period at the time the Agency moved for permanent custody on February 10, 2022.

placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.*, 12th Dist. Brown No. CA2017-11-015, 2018-Ohio-1687, ¶ 22, citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

{¶57} The record reflects that the court considered the best interest factors set forth in R.C. 2141.414(D) and found by clear and convincing evidence that it was in Billy's and Josh's best interest to grant permanent custody to the Agency. Father challenges the court's finding, contending the court did not give sufficient weight to the relationship the children had with him and members of his family, the wishes of the children, his parenting skills and custodial history with Billy and Josh and their half-sisters, and his progress on the case plan. Father argues the evidence offered at the permanent custody hearing demonstrated he had remedied the concerns that led to the removal of Billy and Josh from his care and that legally secure placement could be accomplished with an award of custody to him.

{¶58} After our review of the record, we find no merit to Father's claims. Though evidence was presented that Father and the children are bonded and that the children appear to have some relationship with their paternal grandmother, their half-sister Kim, and

Kim's children, this is but one factor in the best interest test. "[N]o one factor [in the best interest test] is entitled to more weight than the other factors." *In re A.C.*, 10th Dist. Franklin Nos. 22AP-243, 22AP-244 and 22AP-255 thru 22AP-257, 2023-Ohio-836, ¶ 54, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56. Furthermore, while the court considered the children's relationship with their Father and extended family, it also appropriately considered their current living situation and relationship with the foster family. The court noted Billy and Josh were doing well in their foster home, where there were "no issues" and where they were able to maintain a bond with their sisters Anna and Mary. Billy was about to start kindergarten and the children were involved in soccer activities in their community. Though five-year-old Billy and four-year-old Josh were too young to share their custodial wishes directly with the court, the court did consider the guardian ad litem's recommendation that permanent custody be granted to the Agency.

{¶59} The court also considered the custodial history of Billy and Josh, noting that they had been in the Agency's temporary custody since November 25, 2020. Even prior to that date, they had been subject to some form of Agency involvement. The Agency had been actively involved in investigations involving Billy and Josh's half siblings since 2012 with respect to Mother, and since 2015 with respect to Father. In April 2017, approximately a month after Billy's birth, the Agency opened an investigation after it received reports of domestic violence incidents between Mother and Father and reports that Mother had been sexually abusing Sarah. Billy was adjudicated a dependent child as a result of that investigation. While that case was open and Mother and Father were working on a case plan, Josh was born. The case was closed in June 2019. Another Agency investigation was opened in September 2020 after Mother was found in possession of methamphetamine during a traffic stop in which Mary and Anna were in the vehicle. Mary and Anna were

removed from Mother's custody. Billy and Josh were permitted to remain in Father's custody, as the boys and Father had been living independently from Mother. Father was prohibited from allowing the children to have unsupervised contact with Mother. Father was unable to abide by this restriction, and in November 2020, the Agency moved for emergency custody of Billy and Josh. The juvenile court granted temporary custody to the Agency on November 25, 2020, and Billy and Josh were subsequently adjudicated dependent children. The children have been in the Agency's temporary custody since being removed from Father's care on November 25, 2020.

{¶60} Though Father has made progress on his case plan, he has not, contrary to his assertions, completed all case plan services. He has participated in domestic violence and marriage counseling, undergone a mental health assessment, and complied with recommended services. Father takes medication for his schizoaffective disorder as prescribed and he attends counseling sessions regularly. Father is also working on his sobriety by attending weekly A.A. meetings. However, Father failed alcohol screenings in November 2021 and January 2022 and failed to appear for a screening in May 2022. Father's use of alcohol, after ten years of sobriety, remained a concern to the Agency.

{¶61} Though Father has completed a parenting class and a parenting workbook that was part of his case plan services, evidence was introduced that Father has not been able to implement the parenting skills he was taught. May testified that Father has not demonstrated "consistent protective capacity for the kids" and his actions reveal that he is unable to put the interests of the children over those of Mother.

{¶62} Father has also not demonstrated stable housing or income. Historically, Father has had trouble with housing, having been evicted from an apartment, forced to stay in a camper for a few months, and reliant on staying with friends. As of the time of trial,

Father had been renting an apartment in Blanchester for over a year. Mother formerly resided in this apartment, was keeping her belongings in the residence, and was known to come and go from the apartment whenever she wanted. Father indicated that he was in the process of moving to an apartment in Lebanon, one located near Kim, but as of the date of the permanent custody hearing, he had not signed a lease or provided any documentation demonstrating that the move was actually happening.

{¶63} As for Father's income, Father was purportedly receiving $2,800 a month as social security disability income. However, Father never provided bank statements or other documentation to the Agency showing he received this benefit, despite multiple requests from the Agency for this information. Father also neglected to provide documentation to the Agency showing that he had obtained a $10,000 loan and he became defensive when the Agency questioned him about a sudden influx of cash he and Mother appeared to have on hand.

{¶64} Even if Father had completed all his case plan services, that "does not equate to, or necessitate, a finding that the parents have substantially remedied the conditions that caused the removal of the child[ren] from the home." *In re R.K.*, 12th Dist. Warren Nos. CA2021-03-027 and CA2021-03-028, 2021-Ohio-3074, ¶ 24, citing *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 24. "[A] parent can successfully complete the requirements of a case plan, but not substantially remedy the conditions that caused the children to be removed, as the case plan is 'simply a means to a goal, but not the goal itself.'" *Id.*, quoting *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 30.

{¶65} Here, a large source of concern for the Agency was Father's inability to remove himself from a relationship with Mother and his inability to put his children's needs

before Mother's.  As the trial court noted, "[t]hough [Mother] has been the main concern for these children throughout these cases, [Father] has remained with her for more than seven (7) years and has only recently indicated a desire to permanently end their relationship." Mother's and Father's marriage, "albeit tumultuous and containing periods of separation, has consisted through substance abuse, multiple criminal convictions for [Mother], and explicit [c]ourt findings of sexual abuse perpetrated by [Mother] on [Father's] daughter [Sarah]."  Despite Mother's 2015 and 2020 convictions for child endangerment, her decision to consume alcohol and then drive with Billy and Josh in the car, her sexual abuse of Sarah, her use of drugs with Sarah and Jane, and her commission of domestic violence offenses against him, the latter of which often occurred in the presence of the children, Father stayed in a relationship with Mother.

{¶66} Although there were times Father left Mother, he always returned.  For instance, in November 2020, he returned to his relationship with Mother despite he, Billy, and Josh living separately from Mother for a period of months.  He took Billy and Josh to the place where Mother was staying, allowing them to be with Mother as she detoxed from a recent bout with drugs.  Even after the Agency notified Father that they intended to file for permanent custody of Billy and Josh, and then filed the motion in February 2022, Father stayed with Mother.  Though he mentioned the idea of divorcing Mother and moving out of their shared apartment, he did not take any action until months later.  In June 2022, a mere two months before the permanent custody hearing, Father filed for divorce.  As of the date of the permanent custody hearing, he was still residing in the Blanchester apartment.  Though Mother did not routinely stay at the apartment, she kept her belongings there and came and went as she pleased.

{¶67} Although Father testified that he intended to follow through with the divorce

and move into a new apartment away from Mother, and that he would abide by court order to keep the children away from Mother, the juvenile court was entitled to discredit Father's testimony in light of his past actions involving Mother. Father's prior inability to end his relationship with Mother, his refusal to put the safety and needs of his children ahead of his relationship with Mother, and his failure to complete case plan services all support the juvenile court's finding that it was in Billy's and Josh's best interest for permanent custody to be granted to the Agency.

{¶68} "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 12th Dist. Clinton Nos. CA2022-04-010 thru CA2022-04-012, 2022-Ohio-3101, ¶ 45, quoting *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 60. The juvenile court's decision does just that. Billy and Josh have been in the Agency's temporary custody since November 25, 2020, and despite diligent and reasonable efforts by the Agency, Father has been unable to remedy the conditions that caused the children's removal. No secure relative placement is available for the children. Billy and Josh are in need of secure, permanent placement, and it is in their best interest for permanent custody to be awarded to the Agency. Therefore, in light of the aforementioned considerations, we find the juvenile court's decision to grant permanent custody of Billy and Josh to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Father's first assignment of error is overruled.

{¶69} Assignment of Error No. 2:

{¶70} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN FATHER HAD INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

- 25 -

{¶71} In his second assignment of error, Father argues his appointed counsel provided ineffective assistance by failing to cross-examine the guardian ad litem about her report, by failing to challenge the guardian ad litem's allegation that Father had lied about the time he spent with Mother in November 2020, by failing to call additional witnesses or proffer testimony from those witnesses, and by waiving closing arguments.

{¶72} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re B.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 68; *In re L.J.*, 12th Dist. Warren No. CA2014-10-124, 2015-Ohio-1567, ¶ 33. In determining whether counsel was ineffective in a permanent custody hearing, a reviewing court must apply the two-tier test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *In re G.W.*, 12th Dist. Butler No. CA2013-12-246, 2014-Ohio-2579, ¶ 12. That is to say, the parent must show that counsel's performance was outside the wide range of professionally competent assistance *and* that counsel's deficient performance prejudiced the parent. *In re C.S.*, 12th Dist. Warren No. CA2018-07-080, 2018-Ohio-4786, ¶ 33. "A strong presumption exists that licensed attorneys are competent and that counsel's challenged conduct is the product of sound trial strategy and thus falls within the wide range of competent professional assistance." *In re L.J.* at ¶ 33. To show that a parent was prejudiced by his counsel's deficient performance, the parent must show that there is "a reasonable probability that but for his * * * counsel's alleged errors, the result of the proceedings would have been different." *Id.*

{¶73} Following our review of the record, we find Father's claims of ineffective assistance of counsel to be without merit as he has failed to demonstrate that counsel's performance was deficient or that he was prejudiced by any alleged deficiency. Though

Father contends his trial counsel should have cross-examined the guardian ad litem about her report and should have presented additional evidence to contradict her statement that Father had not told the truth about the time he spent with Mother around November 24, 2020, we have previously recognized that "there are no rules dictating what amount of cross-examination is acceptable; rather, this is largely a tactical decision and matter of trial strategy." *In re Hodge*, 12th Dist. Butler Nos. CA94-08-170, CA94-09-174, CA94-09-186, and CA94-09-187, 1995 Ohio App. LEXIS 3246, *12 (Aug. 7, 1995). *See also In C.B.*, 8th Dist. Cuyahoga No. 111456, 2022-Ohio-3136, ¶ 29 (noting that "counsel's determinations regarding making objections and crossing-examining witnesses are tactical decisions that are within the discretion of trial counsel"). Further, Father responded to the guardian ad litem's claim that he was not telling the truth regarding the time he spent with Mother in November 2020. After the guardian ad litem spoke, Father offered an explanation for why the guardian ad litem believed he was with Mother when she called the Ho Ho shop. Father denied being physically present with Mother for the call, but stated he was "in the background" for the call because he was on the line as part of a conference call. As Father had the opportunity to respond to the guardian ad litem's statement, Father cannot demonstrate he was prejudiced. Even if the trier of fact had believed Father on this issue, there was still other credible evidence justifying the juvenile court's decision to grant permanent custody to the Agency.

{¶74} Trial counsel's decision not to call Sarah as a witness, despite her being identified at the start of trial as a potential witness, also did not constitute deficient performance. "[C]ounsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490 (2001). *See also In re L.B.*, 8th Dist. Cuyahoga No. 111766, 2022-Ohio-

4748, ¶ 55; *In re S.L.*, 3d Dist. Logan Nos. 8-17-25 thru 8-17-29 and 8-17-33 thru 8-17-37, 2018-Ohio-1111, ¶ 57. Counsel was entitled to make the strategic decision that calling Sarah as a witness might do more harm than good after hearing testimony about Mother's sexual abuse of Sarah when Sarah was a child and Father's decision to continue a relationship with Mother after the abuse occurred. Counsel also was not deficient for not proffering Sarah's testimony, as a proffer of evidence generally only occurs when the trial court has denied a party from presenting evidence or testimony. Here, trial counsel made a strategic decision not to call Sarah as a witness. As such, there was no denial by the trial court and no need to proffer her testimony.

{¶75} Finally, trial counsel's decision not to give a closing statement was a tactical decision that we will not second-guess on appeal. *See In re C.B.*, 2022-Ohio-3136 at ¶ 29 ("Counsel's decision[s] on whether to give an opening statement or closing argument * * * are tactical decisions"). Further, Father cannot demonstrate he was prejudiced by counsel's decision to waive closing argument as closing arguments are not evidence. *See Hunley v. Hunley*, 12th Dist. Clermont No. CA2019-12-101, 2020-Ohio-5053, ¶ 58. Nothing trial counsel could have stated during closing argument would have altered the significant amount of evidence the Agency presented demonstrating that it was in Billy's and Josh's best interest for permanent custody to be awarded.

{¶76} Accordingly, we find Father's arguments that he received ineffective assistance of counsel to be without merit, and we hereby overrule his second assignment of error.

{¶77} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.