[Cite as *In re L.D.*, 2025-Ohio-2892.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | CASE NOS. CA2025-03-009 |
|  |  | CA2025-03-010 |
| L.D., et al. | : | CA2025-03-011 |
|  |  | CA2025-03-012 |
|  | : | CA2025-03-013 |
|  |  | CA2025-03-014 |
|  | : | CA2025-03-015 |
|  |  | CA2025-03-016 |
|  | : | CA2025-03-017 |
|  |  | CA2025-03-018 |
|  | : | CA2025-03-019 |
|  |  | CA2025-03-020 |
|  | : | CA2025-03-021 |
|  |  | CA2025-03-022 |
|  | : | CA2025-03-023 |
|  | : | OPINION AND |
|  |  | JUDGMENT ENTRY |
|  | : | 8/15/2025 |
|  | : |  |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20233021, 20233022, 20233023, 20233024
and 20233030, 20233031, 20233032

The CMW Law Firm, and Anthony D. Maiorano, for appellant, D.D.

Holly M. Simpson, for appellant, S.C.

Brian A. Shidaker, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

## O P I N I O N

**HENDRICKSON, P.J.**

{¶ 1} Appellants, the biological mother and father of Sophie, Martin, Alice, Lucy, Michael, Matthew, and Nancy, appeal from a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of their children to appellee, Clinton County Children Services ("the Agency").[1] For the reasons discussed below, we affirm the juvenile court's decision.[2]

### I. Facts and Procedural History

{¶ 2} This case involves Mother and Father's seven children: Sophie, born on October 20, 2009; Martin, born on August 11, 2011; Nancy, born on November 18, 2013; Lucy, born on August 14, 2017; Alice, born on February 20, 2019; Michael, born on May 20, 2021; and Matthew, born on May 26, 2022. At all times pertinent to this appeal, Father was incarcerated for drug-related crimes. His expected release date is in December 2025.

### A. Events Leading to the Agency's Complaint

{¶ 3} The Agency has been involved with the family on an intermittent basis since 2012. Relevant to the instant matter, the Agency became involved with the family in February 2023 after the oldest child, Sophie, was adjudicated unruly due to concerns of truancy. As a result of that adjudication, the juvenile court placed Sophie on probation with various conditions. In February 2023, Sophie violated her probation by failing to attend school, failing to receive her mental health, drug, and alcohol treatment, and failing

---

1. Pursuant to App.R. 3(B), we sua sponte consolidate these appeals for purposes of writing this single opinion.

2. To preserve the children's privacy, and for ease of reading, we refer to the children using fictitious names, rather than their initials.

to check in with her probation officer. After a hearing, the juvenile court ordered the Agency to have protective supervision of Sophie, and Jessica Ladnow was assigned as the ongoing caseworker.

{¶ 4} On February 23, 2023, Ladnow contacted Mother to inform her of the Agency's involvement and scheduled an appointment to meet Mother and the children at their home in Blanchester. When Ladnow arrived for the visit, she knocked on the door and it took Mother over five minutes to respond. Mother eventually came to the door and informed Ladnow that she had not forgotten their appointment and that she and two of the children were napping. Mother then submitted a urine screen, which tested positive for amphetamines. At that time, Mother informed Ladnow that she was prescribed Adipex phentermine for weight loss.

{¶ 5} Ladnow conducted a walk-through of the home and observed several safety concerns, including Michael and Matthew sleeping unsafely in Mother's bed; broken handrails and rusty nails throughout the porch; a bag of trash in Martin's room; a fire hazard in the playroom; and medication, both prescription and over-the-counter, on the countertop. Regarding the medication, Mother informed the caseworker that she left the medication, including psychotropics, on the counter so Martin and Sophie could administer them when necessary. Ladnow also observed clutter in the home, beds without sheets, and dishes with old food overflowing the sink, counters, and table.

{¶ 6} During the visit, Mother informed Ladnow that she was unemployed and had difficulty obtaining childcare. Mother also indicated that transportation issues and illnesses interfered with the children's attendance at school. At that time, all three school-aged children struggled with attendance and none of the children had a primary care provider due to missed appointments.

{¶ 7} After the visit, Ladnow investigated Mother's then-paramour, Cameron Rolark, and discovered he was recently incarcerated for armed robbery. Ladnow met with Mother to discuss the Agency's concerns with Rolark. During the meeting, Mother submitted a drug test, which was positive for methamphetamines and amphetamines. Mother's positive drug screen prompted Ladnow and Sophie's probation officer to visit Mother's home unannounced. After discovering none of the children were at school, Ladnow discussed a safety plan with Mother.

{¶ 8} The Agency proceeded with an in-home safety plan involving Mother's landlords, Carla and Bud Clouser, and her sister, Stacy. Three children, Michael, Matthew, and Nancy, were placed with the Clousers. The remaining four children, Sophie, Martin, Alice, and Lucy, were placed with Stacy. Shortly thereafter, the Agency learned that Stacy could not assist with the children on a long-term basis due to domestic violence concerns between Stacy and her children's father.

{¶ 9} On March 8, 2023, the Agency requested emergency custody of Sophie, Martin, Alice, and Lucy. After a hearing, the juvenile court found the children should be removed from Stacy's home and granted temporary custody of the children to the Agency. The court then appointed a guardian ad litem ("the GAL") for the children and set the matter for an adjudication hearing.

### B. The Filing of the Complaint, Adjudication, and Disposition

{¶ 10} On March 16, 2023, the Agency filed a complaint alleging that all the children were dependent and neglected children. In support of the complaint, the Agency summarized the events detailed above and further alleged that Mother admitted to using methamphetamine once and was "addicted" to her prescribed phentermine pill. The Agency also alleged that Sophie and Martin were responsible for taking their own

medications, but Mother could not recall what medication Sophie was prescribed. Regarding Father, the Agency alleged he was incarcerated in prison for drug-related charges.

{¶ 11} The matter was set for an adjudication hearing. Prior to the hearing, the Agency began a kinship home study of the Clousers, which revealed several concerns with the Clousers' care of children. Part of the Agency's concerns stemmed from the Clousers allowing repeated unsupervised contact between Mother and the children, as well as safety hazards in their home. The kinship home study was subsequently denied and the Agency moved for temporary custody of the remaining three children.[3]

{¶ 12} At the adjudication hearing, the parties stipulated to a finding of dependency and the Agency dismissed the allegations of neglect. The juvenile court adjudicated the children dependent, awarded temporary custody of Michael, Matthew, and Nancy to the Agency, and continued the temporary custody order for Sophie, Martin, Lucy, and Alice.

{¶ 13} On May 31, 2023, the juvenile court held a disposition hearing. The court found that it was in the children's best interest to continue their placement in the temporary custody of the Agency and adopted the case plan created by the Agency.

{¶ 14} The case plan identified reunification as the goal for Mother and the children. To facilitate that goal, the case plan required Mother to attend parenting classes, refrain from illegal drug use and the misuse of legal drugs, to complete a drug and alcohol assessment, complete a mental health assessment, secure employment, maintain a hazard free household, and complete a domestic violence program. Due to Father's expected release date of December 2025, the Agency did not include Father on the initial

---

3. Ladnow also testified that she discussed potential placements with Father, including a few friends and his adoptive Mother, though those placements were deemed not appropriate.

case plan. The case plan was later amended and required Father to obtain his GED, complete mental health counseling, complete substance use treatment, and complete parenting education.[4]

**C. The Permanent Custody Proceedings**

{¶ 15} On April 2, 2024, the Agency moved for permanent custody of the seven children. The matter proceeded to a two-day hearing on July 18, 2024 and December 16, 2024.

**1. The Agency's Initial Case-in-Chief**

{¶ 16} At the hearing held on July 18, 2024, Mother and Father were represented by counsel and Father appeared by Zoom.[5] That day, the Agency presented testimony from the initial case worker assigned to the case, Ladnow, as well as expert testimony from Bridget Lorenz Lemberg, a lab director and toxicologist from Forensic Fluids Laboratory.

{¶ 17} The testimony revealed the facts described above and detailed the issues leading to the children's removal in February 2023. Ladnow described the Agency's concerns with the children at the time of their removal, beginning with Sophie, whose braces were removed and subsequently replaced due to inadequate maintenance. Regarding Martin, Ladnow noted that he suffers from ADHD and struggles behaviorally. Since entering the Agency's care, a "potential sex abuse allegation" concerning Martin and one of his younger sisters arose, however, that claim was unsubstantiated.

---

4. Notwithstanding the inclusion of Father on the case plan, the Agency noted that Father could not reunify with the children directly given his release date, as such reunification would extend the Agency's temporary custody of the children beyond 24 months.

5. Father attended part of the initial permanent custody hearing but left the hearing during Ladnow's testimony because he had to attend "count." Father did not explain what "count" meant on the record; however, he noted before leaving that that he would not be "signing over any of [his] rights."

{¶ 18} At the time of removal, Alice had behavioral issues and would frequently engage in meltdowns where she could not be calmed and would cuss at her foster parents. Ladnow described one occasion where Alice, then age four, called her foster mother "a cunt" for attempting to stop Alice's use of a pacifier. Alice also had a few health concerns, including eczema that had resolved by the time of the hearing and a mouth abscess that required surgery.

{¶ 19} In addition to night terrors, Michael engaged in similar behaviors and would curse at authority figures, including referring to an Agency worker as "a bitch" at only one and one-half years old. After entering Agency custody, Michael began receiving mental health services through Butler Behavioral and was placed on an IEP. Matthew also has night terrors and receives mental health services through Butler Behavioral. Additionally, Matthew suffers from a club foot, which he is working to address without surgery.

{¶ 20} Regarding Nancy, the Agency was concerned that Nancy was very parentified. Through conversations with Nancy while she lived with the Clousers, Ladnow discovered that Nancy was responsible for taking care of Matthew, including feeding him throughout the night and rocking him back to sleep. The Agency also observed Nancy's parentified nature during visitation at the Agency.

{¶ 21} Mother made progress on the elements of her case plan. Ladnow testified that Mother was employed at Speedway with adequate housing. Mother had also received mental health and drug and alcohol services through several agencies, with BrightView being the most recent.

{¶ 22} Mother's drug use was a primary issue for the Agency. Lemberg testified that Forensic Fluids Laboratory processed 49 drug screens for Mother. Out of those 49 tests, Mother tested positive 26 times, including 11 positives for methamphetamine; three

positives for cocaine; 13 positives for THC; and three containing phentermine and two containing alcohol. Lemberg indicated that Mother falsely tested positive for methamphetamine on one occasion, however, the remaining positives were confirmed.

{¶ 23} Mother most recently tested positive for methamphetamine on June 18, 2024. Mother disputed the validity of that test and claimed she was drugged. Mother completed a blood test at the hospital on June 21, 2024, which was negative. Although Mother's blood test was negative, Lemberg testified that low levels of methamphetamine would not be detected three days later, as methamphetamine remains in a person's system for less than 24 hours.

{¶ 24} In addition to her methamphetamine use, Ladnow testified that Mother exhibited signs consistent with the excessive consumption of alcohol. As a result, the Agency requested alcohol to be added to her drug screens. When alcohol was included on the screens, Mother sometimes tested positively.

{¶ 25} The Agency was also concerned regarding Mother's prescription for Adipex because, although her prescription was valid, Mother admitted to abusing her Adipex in 2023. At the hearing, Mother denied abusing her prescription and claimed she was addicted to the weight loss. Mother recently switched to a non-stimulant form of medication.

{¶ 26} In addition to Mother's drug use, domestic violence and Mother's choice in men were ongoing concerns for the Agency. At the outset of the case, Mother was involved with Rolark. During her relationship with Rolark, Agency workers observed Mother with a black eye, which she attributed to her cell phone falling on her face, as well as a bruise on her chest. On one occasion in 2023, Mother contacted the police because Rolark threatened to burn her house down. Despite these incidents, Mother denied any

domestic violence occurred between her and Rolark.

{¶ 27} After Mother separated from Rolark, she became involved with Roger Griffith, a friend of Rolark's who had a history of domestic violence charges. Ladnow testified that she expressed concerns to Mother regarding Griffith's involvement in Mother's life, as there had been reports that he had damaged her property and was threatening to burn down her home. Mother explained to Ladnow that Griffith was a support for her.

{¶ 28} Safe and appropriate housing was also an issue at the time of removal. In March 2023, Mother was evicted from the Blanchester home due to her relationship with Rolark. Mother was then homeless for a period before moving into another rental property owned by the Clousers. Griffith was her roommate at the new rental property for approximately four months before Mother returned to the home in Blanchester in April or May 2024.

{¶ 29} Regarding Mother's visitation, Ladnow testified that Mother attended supervised visitation once a week with the children. Out of the 84 visits offered, Mother attended 64 of the visits with the children. According to Ladnow, the visits were chaotic and wild, and Mother struggled to set boundaries for the children. The Agency intervened on several occasions when Mother engaged in inappropriate conversations with the children, including one conversation concerning Mother's positive drug screen for methamphetamine. The Agency believed Mother had difficulty managing the children during the visits and struggled to uniformly tend to all seven children and stay attentive.

{¶ 30} Ladnow testified at length regarding the Agency's history of involvement with the family. The Agency first became involved with the family in 2012 when it received concerns that Father was physically abusing Martin and Sophie. Ultimately, those claims

were unsubstantiated. Later, in 2013, the Agency opened a case of neglect after Sophie and Martin were left unsupervised in a motel parking lot. The police were called, but the family could not be located to further investigate. In 2017, the Agency investigated an unsubstantiated allegation of sexual abuse against Nancy. Then, in 2019, the Agency substantiated a "near death investigation" after learning Mother was unsafely co-sleeping with Alice and Sophie. During the incident, Mother woke up and discovered Sophie's leg over Alice's throat. Alice, who was four months old at the time, was unresponsive with pinpoint pupils. In March 2021 the Agency opened an investigation of neglect due to concerns of Martin and Sophie being truant. A second truancy investigation was opened in March 2022.

{¶ 31} Ladnow then described the events leading to Father's arrest in December 2021. During that incident, Father was inside the family's home with a machete, screaming "absurdities" while under the influence of drugs. Law enforcement officers successfully removed Mother and the children from the home before engaging in a several-hour standoff with Father. After observing Father attack the family dog, the SWAT team entered the home and found Father unresponsive from a possible overdose. At that point, Father was transported to the hospital and was later arrested for drug-related crimes. Father has been incarcerated since that time.

{¶ 32} Based upon the above, Ladnow testified it was in the best interest of the children to be placed in the permanent custody of the Agency. Despite Mother's progress on the case plan, the Agency believed Mother could not "long-term sustain from any type of substance use or men that are not violent." This opinion was based upon Mother's positive drug screens, as well as her history of minimizing domestic violence incidents and continuing to associate with the same dangerous men, despite the domestic violence

that occurs. Thus, although the Agency had seen improvement, it was not enough to comfortably reunify the children with Mother.

{¶ 33} After Ladnow's testimony, the Agency moved to admit its various exhibits and rested its case.

## 2. The Agency's Additional Evidence

{¶ 34} The court continued the remainder of the permanent custody hearing until December 16, 2024. At the beginning of the hearing, the Agency reopened its case due to the length of time that had passed since the initial hearing.[6] As a result of these various continuances, Mother had been working on her case plan for one year and nine months. Her caseworker at the time, Katelyn Strong, testified that she was assigned this case in May 2024, although she was familiar with the family's involvement with the Agency prior to that time. Throughout her testimony, Strong focused on events that had occurred since the initial hearing in July. During that time, Mother obtained a job at McDonald's making $11 per hour but expected a promotion to manager soon. Mother identified the Clousers as potential care givers for the children should they return to her care, however, the Agency had concerns with their ability to care for all seven children while Mother worked. Mother continued to reside at the Clousers' rental home in Blanchester and that home remained appropriate for the children.

{¶ 35} Regarding Mother's mental health and drug and alcohol treatment, Strong testified that Mother completed a program at BrightView on August 19, 2024, and recently initiated telehealth services with a therapist at the suggestion of the Agency. According to BrightView's assessment of Mother, there was no clear evidence of substance use

---

6. The hearing was continued multiple times for various reasons, including giving Mother time to secure witnesses and new counsel.

problems and no evidence she was a danger to herself or others.

{¶ 36} Mother continued to test positive for THC and alcohol after the hearing in July. Aside from one positive on July 5, 2024, Mother denied all use and claimed the positive alcohol screens were due to her mouthwash. Mother informed the case worker that if she were to relapse, it would not be with THC or alcohol, but with methamphetamines.

{¶ 37} Mother was issued a medical marijuana card on July 13, 2024, though she denied using marijuana and attributed her positive screens to others smoking in her vicinity. According to Mother, she obtained the card "just in case" she tested positive for marijuana but told her doctor she needed the prescription for her scoliosis. Mother stated she had not purchased medical marijuana but produced a receipt for marijuana purchased from the dispensary on December 11, 2024. Mother's most recent positive drug screen for THC was on December 5, 2024.

{¶ 38} Strong described the Agency's ongoing concerns with Mother's parenting during her visitation with the children. Mother continued to visit the children at the Agency once a week.[7] Mother also took advantage of additional visits with Sophie and Martin. During visits, Mother continued to struggle with controlling the children and overall, did not progress enough to allow for unsupervised visits or visitations at an alternate location.

{¶ 39} At the time of the second hearing, the five younger children remained in the same foster home and continued to do well in their placement. Sophie and Martin, on the other hand, struggled in their placements and strongly desired to return home to Mother. Regarding Sophie, Strong testified there was a possibility of displacement from her foster

---

7. The Clousers also regularly visited the children, although, the Agency requested those visits stop due to behavioral issues with Michael and Matthew after visits.

home due to recent issues between Sophie and her foster mother. Sophie had difficulty with her separation from Mother, as she and Mother are very well-bonded.

{¶ 40} Martin also struggled in his foster home and was recently transitioned to a group home. According to Strong, Martin has several behavioral concerns and has difficulty respecting authority figures. Martin has a history of acting disrespectfully to the Agency workers, but the group home setting helps him manage. At the time of the second hearing, Martin saw a therapist and was on an IEP for math and English. According to Strong, Martin is doing very well academically, earning mostly A's.

{¶ 41} A large portion of testimony elicited by the Agency concerned Mother's petition for a domestic violence civil protection order against Griffith. A copy of Mother's petition was admitted into evidence and reveals that Mother filed the petition in late July 2024 based upon three incidents of violence that occurred between June 5, 2024 and July 23, 2024. Those incidents include Griffith breaking into Mother's home, spitting on her, damaging her household property, hitting her vehicle with a shovel, and throwing a ladder and mason jar at her vehicle. A fourth incident, not included on the petition, occurred on July 31, 2024, where Mother called the police on Griffith. At that time, Mother informed the officer that Griffith had lived with her for three months.

{¶ 42} Mother initially identified Griffith on her petition as a "person living as a spouse" of hers within the previous five years, however, she denied residing with Griffith at the hearing on her petition. Instead, Mother testified that the victim advocate from Alternatives to Violence, a batterer's intervention program, directed Mother to make false statements on her petition. The victim advocate from Alternatives to Violence testified at the permanent custody hearing that Mother sought to obtain a protection order against "someone who had been residing with her on and off . . ." The victim advocate clarified

that she would not recommend a person to make false statements on their protection order petition and that she assisted Mother with filling out the paperwork.

{¶ 43} Based upon Mother's testimony at the protection order hearing, the court dismissed her petition. At that time, the court informed Mother that she could file a new civil protection order based upon the correct information, to which Mother responded she was no longer concerned and that she was comfortable being around Griffith. At the permanent custody hearing, Mother confirmed that she did not pursue any criminal charges against Griffith and believed it was okay to be around Griffith if he was attempting to make amends. The victim advocate testified that, in the batterer's intervention program, they encourage the victims to not have any contact with their abuser. It is undisputed that Mother continued having contact with Griffith as recently as October 2024.

{¶ 44} Mother acknowledged she has a history of involvement with violent men, including Griffith, Father, and Rolark. Mother initially engaged in domestic violence education in September 2023 but was unable to complete the program due to her work schedule. Mother re-enrolled in the program on August 22, 2024, and participated regularly. According to the victim advocate, Mother began completing take-home packets of information in October because she appeared to misunderstand the in-person lessons. For example, the victim advocate indicated that Mother misunderstood whether continued contact with the abuser was encouraged. In response to questioning by the court, the victim advocate testified that it was possible Mother was not listening to the information. Mother had not had any issues since transitioning to the packet-style course and was scheduled to complete the 20-week class less than two weeks after the hearing.

{¶ 45} On October 23, 2024, there was an incident at Mother's home involving the GAL, Strong, and Griffith's dogs. That day, the GAL and Strong conducted an

unannounced visit at Mother's home. During the visit, one of Griffith's dogs became aggressive toward the GAL and the GAL went to urgent care for a dog bite as a result. There was conflicting evidence presented concerning the dog bite itself–the GAL testified she was attacked, bitten, and bleeding, while the dog warden testified that no dog bite was confirmed–however, all parties agreed it was Griffith's dog that was aggressive and that Griffith was present at Mother's home at the time of the incident.

{¶ 46} At the end of her testimony, Strong noted that, although Mother has completed many elements of her case plan, the Agency is "not looking just for boxes to be checked," but for behavioral change. Strong stated the Agency had hoped to see more behavioral change from Mother by this point and that permanent custody was in the best interest of the children.

### 3. Evidence Presented by Mother at the Permanent Custody Hearings

{¶ 47} Mother presented testimony from Sarah Shull, her substance use disorder counselor from BrightView. Shull testified that she began counseling Mother in January 2024 and completed Mother's initial assessment. After that assessment, Shull developed a relapse prevention plan and recommended Mother engage in follow-up treatment to maintain her sobriety. As part of that plan, Mother completed an eight-week course called Partners in Parenting. Shull testified she sees Mother every other week and that she has observed progress through their sessions. Shull further stated that it would be safe and appropriate, at this point in Mother's treatment, for the children to be reintroduced into Mother's home. On cross-examination, Shull acknowledged she had never observed Mother with the children and that Mother had tested positive for amphetamines on March 12, 2024.

{¶ 48} Mother also presented testimony from Carla Clouser, her landlord and

family friend. Clouser testified that she and her husband had known Mother and her family for eight years. In addition to being Mother's landlord, Clouser testified she provided Mother with a vehicle and a phone and offered other assistance to Mother as needed. Clouser also gave cell phones to Martin and Sophie. Clouser testified that, if the children were returned to Mother, she could provide childcare and assist with the children. According to Clouser, she had addressed the Agency's concerns regarding her home and could safely care for the children while Mother worked. Clouser also testified that she knows Griffith, does not care for him, and does not want him around. Clouser has filed evictions against Griffith in the past, though he has never been on a lease, and has called the police on at least one occasion.

{¶ 49} Mother also testified on her own behalf. During her testimony, Mother acknowledged she had a problem with methamphetamine at the beginning of the case. Mother denied any domestic violence during her relationship with Rolark, but claimed he introduced her to methamphetamine, a drug that he described as "like Adipex."

{¶ 50} Mother testified she met Griffith in September 2023 while she was in active use. Mother denied that Griffith ever lived at her home in Blanchester but acknowledged he and his dogs had stayed there. Mother had discussed her relationship with Griffith with her children and informed them that he has helped her become mentally stronger. Mother described each of the domestic violence incidents involving Griffith and stated the incidents were not "that serious," blamed herself for some of their arguments, and minimized the altercations with Griffith.

{¶ 51} Mother testified she filed the petition for a protection order because "losing somebody as a friend is not worth . . . losing [her] kids." Thus, Mother "wanted to do it because [she] need[ed] to make a change in [her] life." Although she initially wanted a

protection order, Mother then stated she lied on the form and that she continued to allow Griffith around her and in her home. Mother testified that she understood the Agency's and GAL's concerns regarding Griffith and stated he had not been at her home since the incident involving the GAL. In hopes to remedy the Agency's concerns, Mother planned to cease contact with Griffith.

{¶ 52} Regarding her children, Mother testified she is all they have and that she could continue caring for the children if they were returned to her care. Mother specifically noted she has adequate support, transportation, housing, and employment. Mother testified she is lost without her children and asked the court for an opportunity to take accountability for her actions. At the end of her testimony, Mother requested the court to return the children to her care gradually, in a manner consistent with the GAL's recommendations from July.[8]

### 4. Father's Participation in the Permanent Custody Hearings

{¶ 53} As noted above, Father was represented by counsel at each hearing and appeared by Zoom for part of the initial hearing held in July. Father did not appear at the continued hearing held on December 16, 2024, despite court efforts to ensure his appearance. After Mother rested her case-in-chief, Father's counsel proffered to the court what he believed Father would have testified to if given the opportunity. As part of that proffer, counsel stated that Father was incarcerated during the events leading to the children's removal and was expected to be released in December 2025. Father has attempted to better himself during his incarceration, including obtaining his GED, cooperating with the Agency, and visiting with the older children when possible. Father

---

8. As we discuss in more detail below, in preparation for the initial permanent custody hearing in July 2024, the GAL filed a report and recommendation recommending that the motion for permanent custody be denied and that the children be gradually returned to Mother under the protective supervision of the Agency.

supported the children returning to Mother and hoped to reunite with them upon his release. Additionally, counsel noted that Father had provided possible relative placements for the children, however, that was not considered due to a failed home study.

## D. The Juvenile Court's Decision

{¶ 54} On February 27, 2025, the juvenile court issued its decision granting permanent custody to the Agency, finding that the children had been in the Agency's custody for 12 of the prior 22 months and, alternatively, that the children could not or should not be placed with the children's parents within a reasonable period of time. After considering the various factors required by law, the court further determined that it was in the best interest of the children to grant permanent custody to the Agency. In so doing, the court noted that a secure permanent placement could not be achieved without an award of permanent custody to the Agency. Consequently, the court ordered that permanent custody of the children be granted to the Agency, terminating the parental rights of their biological parents.

## II. <u>The Appeals</u>

{¶ 55} Mother and Father separately appealed from the juvenile court's decision granting permanent custody of their children to the Agency. For the purposes of issuing a single opinion, we have consolidated their appeals.

## A. Father's Appeal

{¶ 56} On appeal, Father raises two assignments of error for this court's review.

{¶ 57} Father's First Assignment of Error:

{¶ 58} FATHER'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS EFFECTIVELY DENIED THE ABILITY TO PARTICIPATE IN THE PROCEEDINGS.

{¶ 59} In his first assignment of error, Father claims his right to due process was

violated due to his inability to attend or otherwise participate in the proceedings. We disagree.

{¶ 60} Because the right to raise one's child is recognized as a fundamental right, parents are entitled to due process when the State seeks to terminate this relationship through permanent custody proceedings. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The basic consideration of due process is whether the person had the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *In re J.M.*, 2008-Ohio-6763, ¶ 21 (12th Dist.). Due process of law "implies in its most comprehensive sense, the right of the person affected . . . to be heard, by testimony or otherwise, and to have the right of controverting, by proof, every material fact which bears on the question of the right involved." *Williams v. Dollison*, 62 Ohio St.2d 297, 299 (1980). Due process "is flexible and calls for such procedural protections as the particular situation demands." *Mathews* at 334.

{¶ 61} While an incarcerated individual does not have an absolute right to appear in a civil case in which he is a party, that same parent has a fundamental parental right with regards to his children. *In re Sprague*, 113 Ohio App.3d 274, 276 (12th Dist. 1996). Generally, there is no due process violation when an incarcerated parent does not appear at a parental rights termination hearing, as long as the parent has alternate means of participating. *In re S.F.T.*, 2010-Ohio-3706, ¶ 11 (12th Dist.).

{¶ 62} In determining whether a parent's due process rights were violated in a parental rights termination hearing, courts apply the test set forth by the United States Supreme Court in *Mathews v. Eldridge*. *See e.g.*, *Sprague* at 276; *In re H.S.*, 2013-Ohio-2155, ¶ 7-12 (12th Dist.). Under this test, courts must consider and weigh: 1) the private

interest affected; 2) the risk of erroneous deprivation and the probable value of additional safeguards; and 3) the governmental burden of additional safeguards. *Mathews* at 335.

{¶ 63} With regard to the first *Mathews* factor, "[i]t is well established that a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d at 48. A parent's right to the custody of his child has been deemed paramount, and the permanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. *In re S.F.T.* at ¶ 10. Therefore, the first factor weighs in favor of Father.

{¶ 64} Next, we analyze the second factor in the *Mathews* test to determine the risk of an erroneous deprivation of Father's private interest by his absence at the final permanent custody hearing. Father argues his inability to attend the permanent custody hearing prevented him from presenting evidence concerning his bond with the children, the alternative placements he proposed, and to defend himself from damaging testimony against him. After our review of the record, we disagree with Father's claims. At the hearing, the court heard testimony that Father and the children are bonded and that his visits with the older children were consistent and went well. The caseworkers also testified regarding the placements proposed by Father and explained why those placements were not feasible. Lastly, there is no evidence in the record to suggest the juvenile court granted permanent custody of the children to the Agency based upon any damaging testimony relating to Father.

{¶ 65} Importantly, Father will remain incarcerated until at least December 2025, and, therefore, there is no possibility of placing the children with him within any reasonable time frame. Further, Father was represented by counsel at the hearing. Father's counsel adequately conveyed Father's interest in reunifying with the children in the future, cross-

examined the witnesses presented by the Agency, and proffered Father's expected testimony on the record. The proffered testimony noted Father's desire for the children to return to Mother's care, which would afford Father the opportunity to reunify with them after his release. Accordingly, Father has not demonstrated any prejudice as a result of his absence. The second factor weighs against Father.

{¶ 66} Under the third *Mathews* factor, we must consider the governmental burden of additional procedural requirements. In this case, the juvenile court requested Father's appearance at the permanent custody hearing and believed prison officials would facilitate his appearance by Zoom. However, upon learning the prison officials could not produce Father, the court could have continued the hearing to afford Father an opportunity to appear remotely by telephone or Zoom. When weighing the burden of procuring Father's attendance at some time in the future against the court's interest in resolving the matter without additional delay, we cannot say Father's due process rights were violated in this case. That is, when considering and weighing this factor along with the other *Mathews* factors, we find Father's due process rights were adequately protected.

{¶ 67} Father's first assignment of error is therefore overruled.

{¶ 68} Father's Second Assignment of Error:

{¶ 69} FATHER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED IN THE PERMANENT CUSTODY HEARINGS.

{¶ 70} In Father's remaining assignment of error, he argues his counsel provided ineffective assistance by failing to ensure Father was able to present testimony at trial; failing to cross-examine Strong on the appropriateness of Father's suggested placements; emphasizing Father's time in prison; conducting limited cross-examination

of any witness; failing to object to hearsay statements made by Ladnow; and failing to call favorable witnesses for Father.

{¶ 71} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re B.M.*, 2023-Ohio-1112, ¶ 72 (12th Dist.), citing *In re B.J.*, 2016-Ohio-7440, ¶ 68 (12th Dist.). In determining whether counsel was ineffective in a permanent custody hearing, a reviewing court must apply the two-tier test of *Strickland v. Washington*, 466 U.S. 668 (1984). *In re G.W.*, 2014-Ohio-2579, ¶ 12 (12th Dist.). The parent must show that counsel's performance was outside the wide range of professionally competent assistance and that counsel's deficient performance prejudiced the parent. *Id*. "[A] reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [parent] as a result of the alleged deficiencies." *Id*. at ¶ 13. To show that he was prejudiced by his counsel's deficient performance, the parent must show that there is "a reasonable probability that but for . . . [his] counsel's alleged errors, the result of the proceedings would have been different." *In re L.J.*, 2015-Ohio-1567, ¶ 33 (12th Dist.). A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceedings. *In re C.S.*, 2018-Ohio-4786, ¶ 34 (12th Dist.).

{¶ 72} Regarding Father's assertion that his counsel was ineffective in ensuring his meaningful participation in the hearing, we disagree. As discussed above, Father was not absolutely entitled to appear at the permanent custody hearing where his counsel participated in both hearings regarding the Agency's permanent custody motion, cross-examined the witnesses presented by the Agency at the hearings, and proffered Father's expected testimony at the conclusion of the evidence. Although Father claims his counsel should have conducted a deposition of Father or provided the court with an affidavit of his

expected testimony, he does not claim his counsel's proffered testimony was inadequate, inaccurate, or misleading. As such, we find there is nothing in the record demonstrating Father's counsel's performance was so lacking as to create an unjust result at the permanent custody hearing, or that the result of the proceeding would have been different had Father further participated in the hearing.

{¶ 73} Father next claims his counsel should have more rigorously cross-examined Strong and Ladnow regarding the Agency's investigation into Cara, Father's cousin from New Carlisle. At the hearing, the caseworkers explained that, although Father had provided information about possible familial placements, including a cousin, none of those placements were appropriate. Ladnow testified that Strong discovered Father's cousin was not a viable option due to her history with the Agency. Strong likewise stated that the Agency could not locate any appropriate family members or kinship placements who would be long-term options for the children. There is nothing in the record to suggest the Agency erroneously concluded that Father's cousin was not an appropriate placement or that the Agency did not adequately investigate her as a possible placement.

{¶ 74} Even if the record established such facts, Father could not establish any prejudice in this case. As other Ohio courts have noted, a juvenile court "need not find a child's relative unsuitable before granting an agency permanent custody, and a court is not required to favor a relative where an award of permanent custody serves the child's best interest." *In re O.D.L.*, 2021-Ohio-79, ¶ 15 (2d Dist.), citing *In re A.C.H.*, 2011-Ohio-5595, ¶ 44 (4th Dist.). As such, even if the Agency did not fully investigate Cara, the juvenile court was not obligated to consider placing the children with a relative before awarding permanent custody to the Agency.

{¶ 75} We also find no merit to Father's claim that his counsel should have more

- 23 -

thoroughly cross-examined the Agency's witnesses regarding his violent history. As an initial note, this court has previously recognized that "there are no rules dictating what amount of cross-examination is acceptable; rather, this is largely a tactical decision and matter of trial strategy." *In re B.M.*, 2023-Ohio-1112, at ¶ 73. Additionally, the record reflects that Father's violent history was not at issue in this case, aside from establishing that Mother has a history of involvement with violent men. The Agency caseworkers confirmed this at the hearing and testified that the children's removal did not stem from Father's actions or his alleged abuse or neglect of the children.

{¶ 76} Regarding his counsel's reference to the length of Father's incarceration, we also find no merit. Father's counsel could have reasonably believed that distancing Father from the events leading to the children's removal and the events underlying the Agency's permanent custody motion would be beneficial to Father. In any event, Father cannot establish any prejudice stemming from his counsel's strategy, as placement with Father was not an option given his incarceration, and Father's incarceration is unrelated to any potential familial placement. *See* R.C. 2151.414(E)(12).

{¶ 77} Lastly, we reject Father's argument that his counsel was ineffective for electing not to call additional witnesses, such as Cara, to testify on his behalf. Father claims that if he and Cara had testified, the juvenile court may have ordered legal custody to Cara, and Father could have maintained his bond with the children. However, the decision not to call certain witnesses does not per se constitute deficient performance or ineffective assistance of counsel. This is because "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 2001-Ohio-4, ¶ 109. In this case, counsel was entitled to make the strategic decision that calling Cara as a witness would be futile given the

Agency's evidence that Cara was investigated and rejected as a possible placement, in addition to the fact that Cara never filed for custody of the children.

{¶ 78} Accordingly, we find Father's arguments that he received ineffective assistance of counsel to be without merit, and we hereby overrule his second assignment of error.

**B. Mother's Appeal**

{¶ 79} As noted above, Mother also appeals from the juvenile court's decision and raises four assignments of error for this court's review.

{¶ 80} Mother's First Assignment of Error:

{¶ 81} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN THE AGENCY DID NOT ENGAGE IN REASONABLE CASE PLANNING AS REQUIRED BY THE OHIO REVISED CODE.

{¶ 82} In her first assignment of error, Mother argues the juvenile court erred when it awarded permanent custody of her children to the Agency because the Agency failed to create a case plan that, if completed, could reunite the children with Mother. We disagree.

{¶ 83} The right to parent one's children is a fundamental right. *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *In re Hayes*, 79 Ohio St.3d at 48. Thus, except for some narrowly-defined statutory exceptions, the State must demonstrate that it has made reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. *In re C.F.*, 2007-Ohio-1104, ¶ 43.

{¶ 84} The Ohio Supreme Court has found that R.C. 2151.414 does not require the juvenile court to make a determination whether reasonable efforts to reunify the family have been made in every R.C. 2151.413 motion for permanent custody. *Id*. However, if

the children services agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time. *Id*.

{¶ 85} R.C. 2151.412(A)(2) requires a children's services agency to prepare a case plan for any child over whom the agency has temporary custody. The "general" goals of a case plan for children in the temporary custody of a children's services agency is to achieve, consistent with the best interest and special needs of a child, "a safe out-of-home placement in the least restrictive, most family-like setting available and in close proximity to the home from which the child was removed or the home in which the child will be permanently placed" and "[t]o eliminate with all due speed the need for the out-of-home placement so that the child can safely return home." R.C. 2151.412(G)(1).

{¶ 86} In this case, the juvenile court found that the Agency had made reasonable efforts both to prevent the continued removal of the children and to prevent an award of permanent custody. On appeal, Mother argues the Agency's request for permanent custody was premised upon a condition not included in Mother's case plan, i.e., her friendship with Griffith. Therefore, Mother contends her case plan was insufficient and reasonable efforts to reunite her with the children were not taken.

{¶ 87} In support of her argument, Mother cites to *In re M.P*, 2015-Ohio-4417 (9th Dist.). In that case, the appellate court considered a mother's appeal from a juvenile court's decision awarding permanent custody of her children to a children's services agency. *In re M.P.* at ¶ 8. The mother's case plan required her to complete domestic violence education and to cease contact with the father of some of her children, which she did. *Id*. at ¶ 23. At the permanent custody hearing, the caseworker and guardian ad litem "implied" that the mother had violated the terms of her case plan by having contact

with her daughter and a different paramour, though the case plan did not prohibit contact with those individuals. *Id*. at ¶ 24-25. In its decision, the juvenile court discussed the domestic violence services included in the case plan, as well as the implicit requirements noted by the caseworker and guardian ad litem. *Id.* at ¶ 24. In so doing, the court stated that the mother "was only required to comply with the written requirements of the journalized case plans, not additional requirements that the caseworker or guardian ad litem seemed to believe had been imposed upon her." *Id*. As such, the appellate court determined that there was no evidence the mother had failed to comply with the provisions of the case plan. *Id.* at ¶ 25.

{¶ 88} After reviewing *In re M.P.*, we find it distinguishable from the facts of this case. As stated above, Mother claims that terminating her friendship with Griffith was not a requirement of the case plan and therefore, the Agency should not have considered her friendship with Griffith as a basis for permanent custody. While this court acknowledges that Mother's case plan does not specifically prohibit her from having contact or a friendship with Griffith, we find the nature of their relationship inherently contrary to the elements of her case plan.

{¶ 89} The record reflects the Agency added domestic violence services to Mother's case plan after claims of domestic violence between her and Rolark. The domestic violence services were added due to "Mother's choice in men and their criminal and drug histories." The case plan, which was adopted by the juvenile court in May 2023, required Mother to complete an approved domestic violence class and "to demonstrate a healthy relationship in her interactions and communications" with her then-paramour, Rolark. Based upon this information, it is evident that violent men, Mother's choice in unsafe partners, and her inability to engage in healthy relationships were

Agency concerns that Mother needed to address pursuant to the case plan.

{¶ 90} At the permanent custody hearing, the Agency provided ample evidence that Mother's relationship, whether romantic or platonic, with Griffith was unhealthy and riddled with violent encounters. Despite these encounters, and after nearly completing her domestic violence coursework, Mother continues to minimize her altercations with Griffith and remains unable to appreciate the Agency's concerns with Griffith or the impact an environment prone to violent and criminal behavior could have on her children. Considering Mother's history of choosing men, including Griffith, Rolark, and Father, that are unsafe for herself and her children, the Agency remained concerned with returning the children to an environment with domestic violence. These concerns were identified near the beginning of the case, before Mother had befriended Griffith, and remained largely unaddressed by Mother at the time of the permanent custody hearing.

{¶ 91} We similarly reject Mother's contention that the case plan, if completed, was insufficient to reunify Mother with the children. Even if Mother had completed each element of her case plan, it is well established that the completion of case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 2002-Ohio-7278, ¶ 13 (12th Dist.); *In re S.U.*, 2014-Ohio-5166, ¶ 35 (12th Dist.) ("[t]he case plan is merely a means to a goal and not a goal in itself"). Rather, the main concern is not whether a parent has successfully completed a case plan, but whether the parent has "substantially remedied the concerns that caused the removal from the parent's custody." *In re: V.R.R.*, 2023-Ohio-185, ¶ 35 (12th Dist.). Stated another way, the completion of case plan requirements alone, without behavioral change, would not require the Agency to return the children to Mother. Instead, a parent could complete all of the case plan goals and the juvenile court could still appropriately terminate their parental rights if doing

so is in the best interest of the children. *Id*.

{¶ 92} Here, the Agency presented evidence that, despite Mother's progress on her case plan, she had not implemented any real behavioral change. Notably, the Agency's concerns at the time of permanent custody hearing stemmed beyond the domestic violence issues, and also related to Mother's legal drug use and her parenting abilities.

{¶ 93} Based on all the above, we find no merit to Mother's claim that the case plan was insufficient to reunite the children with their mother or that the Agency's allegedly poor case planning negated the efforts it took to reunify the family. Accordingly, Mother's first assignment of error is overruled.

{¶ 94} Mother's Second Assignment of Error:

{¶ 95} THE AWARD OF PERMANENT CUSTODY TO THE AGENCY VIOLATES MOTHER'S CONSTITUTIONAL RIGHTS TO RAISE HER CHILDREN.

{¶ 96} A parent's relationship with her child is included among the rights that are protected under the Fourteenth Amendment against unwarranted usurpation, disregard, or disrespect by the state. *In re B.C.*, 2014-Ohio-4558, ¶ 17. Suitable parents "have a 'paramount' right to the custody of their minor children." *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *In re Perales*, 52 Ohio St.2d 89, 97 (1977). However, these rights are not absolute, as "[t]he constitutional right to raise one's children does not include a right to abuse, exploit, or neglect them, nor is there a right to permit others to do so." *In re K.H.*, 2008-Ohio-4825, ¶ 40, citing *In re D.A.*, 2007-Ohio-1105, ¶ 11.

{¶ 97} In this case, Mother claims her constitutional rights were violated when the juvenile court awarded permanent custody of her children to the Agency based upon her status as an abused parent. Essentially, Mother claims the juvenile court treated her, an

- 29 -

abused parent, differently than parents who are not abused. After our review, we find Mother's assertion is wholly unsupported by the record.

{¶ 98} In its decision, the juvenile court detailed the relevant facts it considered when granting the Agency's permanent custody motion. Important here, the court highlighted the lack of behavioral changes in Mother despite her participation in case plan services; the length of time the children had been in the Agency's care; the type of male companion Mother has historically chosen; the family's repeated informal involvement with the Agency; and that any changes made by Mother in the past were superficial and not sustained long-term. The juvenile court's decision does not indicate, in any way, that the award of permanent custody to the Agency was based upon Mother being a victim of domestic violence. To the contrary, it is evident from the court's decision that it, and the Agency, was concerned that Mother engages in relationships with unsafe men and continues to subject herself, and consequently the children, to violent situations.

{¶ 99} Mother further claims that the Agency's preparation and development of the case plan were not narrowly tailored to achieve its interest in ensuring the safety of her children. Mother bases this argument upon her belief that the Agency's primary concern throughout the permanent custody proceedings was Mother's relationship with Griffith, and the Agency did not update the case plan to remedy that concern. For the same reasons we stated in response to Mother's first assignment of error, we reject the similar arguments she raises here. The development of the case plan was not insufficient to reunite the children with Mother and was narrowly tailored to achieve that goal.

{¶ 100} Accordingly, Mother's second assignment of error is overruled.

{¶ 101} Mother's Third Assignment of Error:

{¶ 102} THE TRIAL COURT'S DECISION TO AWARD PERMANENT CUSTODY

TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN AN AWARD OF PERMANENT CUSTODY.

{¶ 103} In her third assignment of error, Mother argues the juvenile court's decision granting permanent custody of her children to the Agency was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 104} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 2015-Ohio-4315, ¶ 11 (12th Dist.), citing *Santosky,* 455 U.S. at 769. Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 2014-Ohio-2580, ¶ 9 (12th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.); R.C. 2151.414(B)(1). Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). Only one of these

findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.G.*, 2023-Ohio-4082, ¶ 58 (12th Dist.).

{¶ 105} "Because R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination.'" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11. Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

### 1. Second Part of the Permanent Custody Test

{¶ 106} With regard to the second part of the permanent custody test—that is, whether one of the conditions described in R.C. 2151.414(B)(1)(a), (b), (c), (d), or (e) are met—the juvenile court found that the children had been in the custody of the Agency for

"12 out of 22 consecutive months," and that "the children cannot be placed with the children's parents within a reasonable period of time or should not be placed with the children's parents."

{¶ 107} Pursuant to R.C. 2151.414(B), a child is considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated or the date that is 60 days after the removal of the child from the home. Additionally, the Ohio Supreme Court has explained that when determining whether a child has been in an agency's custody for 12 of the previous 22 months, the relevant time period to consider is the 22 months prior to the date the permanent custody motion was filed. *In re C.W.*, 2004-Ohio-6411, ¶ 26. Here, the children were considered to have entered the temporary custody of the Agency on April 20, 2023, the date they were adjudicated dependent. The Agency filed its motion for permanent custody on April 2, 2024, just under 12 months later. Therefore, when the Agency filed its motion for permanent custody the children had not been in the Agency's temporary custody for 12 of the previous 22 months and the juvenile court erred in finding that the "12 of 22" condition of R.C. 2151.414(B)(1)(d) was met.

{¶ 108} Nevertheless, the juvenile court also found that the children could not be placed with Mother within a reasonable period of time. Only one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) needs to apply in order to satisfy the second prong of the two-part permanent custody test. *In re C.S.* at ¶ 16. As such, the court's finding that the children could not be placed with Mother within a reasonable time, if supported by clear and convincing evidence, rendered the juvenile court's "12 of 22" error harmless. *In re J.M.*, 2025-Ohio-1406, ¶ 26-27 (12th Dist.), citing *In re D.C.*, 2015-Ohio-3178, ¶ 34 (12th Dist.)

{¶ 109} Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before determining a child cannot or should not be placed with either parent within a reasonable period of time or should not be placed with the parents. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exists.

{¶ 110} In this case, the juvenile court found that R.C. 2151.414(E)(1) applies in that "despite reasonable case planning and diligent efforts to assist the family, the parents have repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home." As set forth in our statement of facts above, despite the significant progress Mother made on her case plan, the Agency did not believe she made the necessary behavioral changes to sustain any positive change long-term. Mother contends the Agency disregarded her efforts and the juvenile court gave no weight to her progress on the case plan. In support, Mother points to testimony that she lived in an appropriate home; completed domestic violence classes, completed counseling, and was not romantically involved with either Father, Rolark, or Griffith. According to Mother, her progress on the case plan demonstrates her commitment to the children.

{¶ 111} After our review, we find no error in the juvenile court's finding that Mother failed to substantially remedy the conditions that caused the children to be removed from her home. As we discussed in Mother's first assignment of error, "[t]he key concern is not whether the parent has successfully completed the case plan, but whether the parent has substantially remedied the concerns that caused the child's removal from the parent's custody." *In re K.P.*, 2022-Ohio-1347, ¶ 33 (12th Dist.). "[S]ubstantial compliance with a case plan, in and of itself, does not prove that a grant of permanent custody to an agency is erroneous." *In re M.C.*, 2014-Ohio-5190, ¶ 32 (12th Dist.).

{¶ 112} In this case, the Agency presented significant evidence that, although Mother was "checking boxes" on her case plan, many of the Agency's concerns identified at the outset of the case remained. These concerns include Mother's choice in men, exposure to domestic violence, parenting of the children, and her supplementation of legal substances (alcohol and marijuana).

{¶ 113} Regarding Mother's parenting ability, the testimony at trial revealed that, despite her completion of a parenting course, Mother continued to engage in parenting practices that caused concern for the Agency. Over the life of the case, the Agency remained concerned with Mother's inability to set boundaries with the children and to engage with the children in an appropriate manner. The Agency was also concerned with Mother's refusal to employ safe sleep practices, despite a near fatality involving Alice. Furthermore, due to Mother's history of involvement with dangerous men, even after the Agency's involvement in this case, the Agency believed that Mother would continue to choose men that were unsafe for herself and the children and expose the children to environments containing domestic violence.

{¶ 114} Mother also failed to remedy the Agency's concerns regarding her use of substances, both legal and illegal. The record reflects Mother has tested positively for methamphetamine as recently as June 2024. Although Mother was not prohibited, per her case plan, from consuming alcohol, the Agency advised Mother that it expected her to be "truly sober," meaning she would be free of any mind-altering substances. Due to these expectations, the Agency considered Mother's positive alcohol and THC screens as noncompliance with her case plan. Despite learning the Agency's expectation of true sobriety, Mother failed to remedy the issue. Instead, Mother obtained a medical marijuana card to explain any positives for THC and overtly denied any use of alcohol.

{¶ 115} Though Mother had nearly completed a batterer's intervention program at the time of the permanent custody hearing, evidence was introduced that Mother has not been able to implement the skills she was taught. The Agency caseworkers testified that Mother continued to associate with Griffith, despite numerous instances of violent behavior between the two. At the time of the hearing, Mother remained unsure as to the relationship and contact a victim should have with her abuser. Although Mother testified she planned to cease all contact with Griffith, the juvenile court was not required to find her statement credible. Mother's history of prioritizing her relationships with violent men is paramount in this case, and, aside from her own testimony, there is no evidence she will change this pattern of behavior. As this court has stated previously, "when dealing with the life of . . . young child[ren], such as the case here, the juvenile court cannot, and should not, blindly accept one's claims of self-healing without some type of verification." *In re J.C.*, 2018-Ohio-1687, ¶ 29 (12th Dist.).

{¶ 116} In its decision, the juvenile court considered Mother's progress on the case plan but clearly gave greater weight to the concerns addressed above. Due to Mother's inability to make substantive behavioral changes, the juvenile court did not believe she could sustain any real long-term change. Mother's inability or unwillingness to implement real change is evident from the record. The Agency has been repeatedly involved with the family for more than 11 years and Mother continues to struggle with many of the same issues, including truancy, exposure to drug activity and violent men, and issues with safe sleep.

{¶ 117} In light of all the above, we conclude the juvenile court's finding that the children could not or should not be placed with Mother within a reasonable period of time is supported by clear and convincing evidence.

**2. First Part of the Permanent Custody Test – Best Interest of the Children**

{¶ 118} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. This includes, but is not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child. *In re R.K.*, 2021-Ohio-3074, ¶ 18 (12th Dist.).

{¶ 119} "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31. Furthermore, no one best-interest factor is given greater weight or heightened significance pursuant to R.C. 2151.414(D)(1). *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Nor is any one factor dispositive. *In re R.D.*, 2021-Ohio-3780, ¶ 25 (12th Dist.). R.C. 2151.414(D)(1) "does not prioritize the factors. The juvenile court must be free to use its discretion to determine the relative weight to be accorded to the factors based on the particular circumstances of the case before it." *In re J.L.M.*, 2016-Ohio-2773, ¶ 23 (12th Dist.).

{¶ 120} Mother argues the juvenile court's best interest determination is against the manifest weight of the evidence and is supported by insufficient evidence because (1) the juvenile court improperly gave weight to the recently-changed recommendation of the

GAL and (2) the juvenile court did not adequately consider the wishes of the older children.

{¶ 121} The record indicates that, in her report filed in advance of the initial permanent custody hearing, the GAL recommended the children gradually return to Mother under the Agency's protective supervision. In preparation for the December 16, 2024 hearing, the GAL filed a new report recommending the court award permanent custody of the children to the Agency. Although Mother claims the GAL did not offer "any specific information" concerning the change in recommendation, the record reflects otherwise.

{¶ 122} At the hearing, the GAL testified her change in recommendation was based upon Mother's attitude toward the case and her continued interactions and relationship with Griffith. It is undisputed that between the two permanent custody hearings, Mother petitioned for a domestic violence civil protection order against Griffith, in which she indicated that Griffith had lived with her as a spouse, and that she recanted those allegations approximately one month later. Mother also continued to test positively for legal substances despite Agency requests that she be truly sober. The juvenile court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to consider it in the context of all the evidence before the court. *In re K.A.*, 2021-Ohio-1772, ¶ 47 (5th Dist.). The juvenile court was aware of the GAL's initial recommendation that the children should return to Mother. Therefore, the court was free to decide what weight to give the GAL's report in light of the evidence presented.

{¶ 123} We also are unpersuaded that the juvenile court should not have considered the GAL's report and recommendation based upon the October 2024 dog bite incident. Issues relating to the credibility of witnesses and the weight to be given to the

- 38 -

evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Deferring to the juvenile court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997). As such, despite the contradicting evidence presented concerning the dog bite incident, the juvenile court was in the best position to judge the witnesses' credibility and to determine the weight to be given to their testimonies. As this court has previously recognized, it is the juvenile court's responsibility to determine the GAL's credibility and the weight to be given to the report. *Mackowiak v. Mackowiak*, 2011-Ohio-3013, ¶ 78 (12th Dist.), citing *In re Sydney J.*, 1999 Ohio App. LEXIS 4558 (Sept. 30, 1999, 6th Dist.).

{¶ 124} Lastly, we reject Mother's argument that the juvenile court did not adequately consider the wishes of the older children. Mother points out that the GAL report does not mention the wishes of the older two children, however, the record reflects the juvenile court conducted in camera interviews with the older children and considered their testimony in its decision. In addition to the in camera interviews, the Agency presented significant evidence that Martin and Sophie strongly desired to return home to Mother, a fact included in the juvenile court's decision. Notwithstanding these desires, the Agency felt permanent custody to the Agency remained in the best interest of the children. This is because, although "they are older . . . they are still vulnerable." Ladnow noted that the children had been through a lot in their lives and reunifying them with Mother could expose them to unsafe situations for an additional four to five years.

{¶ 125} The juvenile court, just like this court, must act in a manner that places the children's best interests above all else. "'A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re*

*D.E.*, 2018-Ohio-3341, ¶ 60 (12th Dist.). The juvenile court's decision to grant permanent custody to the Agency in this case does just that. Despite working on her case plan services for approximately 21 months at the time of the permanent custody hearing, Mother simply cannot offer her children the safe and secure placement they need.

{¶ 126} After carefully and thoroughly reviewing the remaining arguments and the evidence in this case, we find the juvenile court's determination regarding the best interest of the children is supported by clear and convincing evidence and was not against the manifest weight of the evidence. We likewise find the juvenile court's finding the children could not be placed with Mother within a reasonable period of time or should not be placed with her is not against the manifest weight of the evidence and is supported by sufficient evidence. Mother's third assignment is overruled.

{¶ 127} Mother's Fourth Assignment of Error:

{¶ 128} THE TRIAL COURT ERRED IN FAILING TO GRANT MOTHER ADDITIONAL TIME TO COMPLETE HER CASE PLAN.

{¶ 129} In her remaining assignment of error, Mother contends the juvenile court should have extended the Agency's temporary custody of the children for six months instead of granting permanent custody to the Agency. Mother concedes that neither party requested such an extension in this case but claims that a six-month extension was warranted because Mother had accomplished the elements on her case plan.

{¶ 130} Pursuant to R.C. 2151.415(D) and Juv.R. 14, a juvenile court may extend a temporary custody order for a period of six months if it determines, by clear and convincing evidence, that the extension (1) is in the best interest of the child, (2) there has been significant progress on the case plan of the child, and (3) there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise

- 40 -

permanently placed within the period of extension. *In re I.C.*, 2022-Ohio-3101, ¶ 50 (12th Dist.). "'Notably the [extension] statute provides only that the juvenile court may extend the temporary custody order, not that it *must* do so.'" (Emphasis in original.) *In re T.W.*, 2017-Ohio-8268, ¶ 25 (12th Dist.), quoting *In re H.G.*, 2015-Ohio-1764, ¶ 20 (12th Dist.). Furthermore, a juvenile court is not required to sua sponte grant an extension of time to allow a parent to work toward reunification. *See In re K.K.*, 2023-Ohio-400, ¶ 48-50 (12th Dist.).

{¶ 131} In this case, Mother cannot establish any error resulting from the juvenile court's decision to not sua sponte grant a six-month extension of temporary custody. As we discussed in Mother's third assignment of error, there is nothing in the record to support a reasonable belief that the children could be reunified with Mother within any reasonable time.

{¶ 132} Additionally, although Mother would like additional time to complete her case plan, this court has recognized that "a parent is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re A.W.*, 2014-Ohio-3188, ¶ 23 (12th Dist.). In this case, the Agency moved for permanent custody of the children in April 2024, more than 12 months after the children were removed from Mother's care. The initial hearing on the permanent custody motion commenced four and one-half months later, in July 2024, and the second hearing occurred five months later. Although Mother worked on case plan services during that time, she was also exposed to additional domestic violence situations and supplemented with legal drugs. Based upon the record before us, we conclude Mother had sufficient time to work on her case plan and remedy the conditions that led to the children's removal.

{¶ 133} Therefore, Mother's fourth assignment of error is overruled.

## III. Conclusion

{¶ 134} Mother and Father both contest the juvenile court's decision to award permanent custody to the Agency. For the reasons set forth above, we find Mother's and Father's arguments to be without merit, and the judgment of the juvenile court is affirmed.

{¶ 135} Judgment affirmed.

**M. POWELL, J., concurs.**

**PIPER, J., concurs in part and dissents in part.**

**PIPER, J., concurring in part and dissenting in part.**

{¶ 136} I respectfully dissent from the majority's decision in Mother's appeal. Specifically, I disagree that the manifest weight of the evidence supports that an award of permanent custody to the Agency is in the best interest of the children. At least two of the children in this case are older children who have long-term bonds with Mother, as well as with each other, and have consistently expressed their wishes to be reunited with Mother. A stable, permanent home preserving these bonds would be in their best interests. No evidence was presented that anyone is interested in adopting these children and the likelihood of the seven siblings being adopted into the same family is slim.[9]

{¶ 137} Although the majority concludes Mother has not demonstrated sufficient behavioral changes to warrant the return of her children, I respectfully disagree. The evidence produced at the permanent custody hearings reveals that Mother has made important strides on her case plan and is working hard to address her history of

---

9. While challenged with struggle and hardship Mother's Herculean task of raising seven children with little help remained unyielding. The number of children is not a prima facie case of random partnerships as they were all fathered by the same man.

domestically violent partners and substance abuse. By filing her petition for a domestic violence civil protection order, even if later dismissed, Mother took a significant step towards protecting herself and attempting to create a better environment for herself and the children.[10]

{¶ 138} It is undeniable that throughout much of the case, Mother maintained employment, as well as a safe and stable home, and reliable transportation. Such progress is not indicative of a parent who lacks the ability or commitment to provide and care for her children. Mother is criticized for her poor choices in men. However, it must be noted that the most concerning, in the Agency's opinion, inappropriate association with poor choices occurred while the children were not in her custody and no evidence revealed a detrimental effect upon the children. *See In re Knuckles*, 2003-Ohio-4418, ¶ 31-32 (12th Dist.), *see also In re A.V.*, 2021-Ohio-3873, ¶ 28-30 (where negative behavior of the parent occurs outside the presence of the children must have a detrimental consequence effecting the children).

{¶ 139} The Agency similarly condemns Mother for her drug use throughout the case, though there was no direct evidence such use occurred in the presence of the children. The record reflects Mother has largely tested negative for methamphetamine in 2024, aside from a few positive screens that Mother disputes. Despite Mother's alleged use of drugs there was no evidence indicating Mother was a drug addict.[11] Notwithstanding the clear effort from Mother to address her use of methamphetamine,

---

10. Mother has since terminated her association with the alleged abuser and thus accomplished her intended purpose of protecting herself and the children.

11. At least one court has acknowledged the struggle to maintain sobriety takes an average of four years and will involve multiple relapses before an ultimate success. *See State v. Lloyd*, 2024-Ohio-1297, ¶ 7 (2d Dist.). Despite relapses in the use of illegal drugs, courts have given "second chances" when observing a dedication to recovery. *Columbus Bar Assn. v. Ashton*, 2006-Ohio-78, ¶ 28. One could easily believe there's no stronger motivation for sobriety than a Mother's love and desire to keep her children.

the Agency placed significant weight on her continued use of alcohol and marijuana. I find this weight to be misplaced. While I acknowledge the Agency preferred to see "true sobriety" from Mother, we should not minimize the improvement she has demonstrated toward remedying her illegal drug use.

{¶ 140} Furthermore, the GAL initially recommended the Agency's permanent custody motion be denied, the temporary custody order be extended for six months, and to slowly send the children home over the following several months. After all children were returned to Mother, the GAL recommended the Agency retain protective supervision of the children for three months. Retaining protective supervision from the Agency would have provided support and encouragement for Mother's continued progress; a less drastic state action than permanently removing the children from Mother.

{¶ 141} Considering the ages of the children, their expressed desires and developed bonds, the recent recommendation of the GAL, and Mother's noteworthy progress on the case plan, the best interests of the children would be served with a gradual return to Mother's custody consistent with the manner initially proposed by the GAL. This is because I feel the greater weight of the evidence does not support an award of permanent custody to the Agency and is unwarranted in this case.

{¶ 142} For these reasons, I would sustain Mother's third assignment of error and find the juvenile court's decision, as it relates to Mother, should be reversed. With regard to Father's appeal, I concur with the majority that the juvenile court's decision should be affirmed.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

_____
/s/ Robert A. Hendrickson, Presiding Judge


_____(concurs in part and dissents in part)_____
Robin N. Piper, Judge


_____
/s/ Mike Powell, Judge